**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MASTER TEXTILE MILLS, LTD., | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | 2:25-cv-00515 |
| | : | |
| RSA GLOBAL LOGISTICS, LLC, | : | |
| | : | |
| *Defendant.* | : | |

**OPINION AND FINAL JUDGMENT**

## I.    INTRODUCTION

Plaintiff Master Textile Mills, LTD (Master) filed a three-count Complaint against Defendant RSA Global Logistics (RSA) asserting liability under the Carmack Amendment, 49 U.S.C. § 14706, common law breach of contract, and bad faith. Specifically, Plaintiff's Complaint asserts that RSA is liable for merchandise destroyed while in transit when the truck carrying the merchandise and operated by non-party Green America Trucking, Inc., caught fire.

On November 13, 2025, this Court denied the parties' cross-motions for summary judgment.[1]  On April 8, 2026, this Court held a one-day bench trial to address Plaintiff's claims.  After Master rested, RSA moved to dismiss the Complaint with prejudice.  After argument on RSA's motion, this Court dismissed Master's breach of contract and bad faith claims with prejudice.  Trial Tr. at 140, Apr. 8, 2026.

---

[1]    The general failure to adhere to this Court's protocols prevented the Court from efficiently evaluating this matter *via* the parties' motions practice.

At the close of trial, the Court recorded preliminary findings of fact.  Now, after careful consideration of the entire record in this matter, the Court enters final judgment on the merits.[2]

## II.    <u>FINDINGS OF FACT</u>[3]

### A. The Parties

**1.**  Master is a corporation organized and existing under the laws of Pakistan with its principal place of business located in Lahore, Pakistan.

**2.**  RSA is a Pennsylvania corporation with its principal place of business located in Newtown, Pa.

**3.**  Master Textile manufactured goods in Pakistan for non-party Lucky Brand (Lucky).

**4.**  Lucky arranged for the goods to be shipped to the United States from Pakistan *via* non-party DHL.

**5.**  When the goods arrived at a United States port in New Jersey, Lucky encountered a problem with its ultimate purchaser, non-party Costco, which caused a delay.  Trial Tr. at 99, Apr. 8, 2026.

**6.**  Master engaged non-party DMK (Eagle Shipping) to intervene and make arrangements for warehousing and shipping from New Jersey to California.

**7.**  DMK contact its agent, Defendant RSA, to make these arrangements.

---

[2]    Plaintiff's lead cause of action under the Carmack Amendment gives this Court original jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337(a). Venue is appropriate in the Eastern District of Pennsylvania pursuant to 49 U.S.C. § 14706(d).  RSA has not challenged jurisdiction or venue.

[3]    *See* Trial Tr. at 196 – 198, Apr. 8, 2026.

**8.** DMK and RSA had, at the time of the subject incident, a liability arrangement contained in their Agency Agreement that read as follows:

**Operational Responsibilities**

The Agents will provide **total multimodal freight services**, either independently or utilizing the services of Third Parties.  **Each Agent assumes full responsibility for all Third Parties as selected by them**.

Pl.'s Ex. 1 (emphases added).[4]

**9.** RSA arranged for the transportation of the goods to California through non-party TQL.

**10.** TQL further arranged for non-party Green America Trucking to physically transport the goods from New Jersey to California and TQL insured Green America's transport of the goods.

**11.** TQL's arrangement with RSA limits TQL's liability for products damaged during shipping to $100,000, unless a value in excess of that amount is expressed prior to shipment.

**12.** RSA never requested valuation regarding the goods.  Accordingly, TQL was never informed the value of the goods exceeded $100,000.

**13.** The Green America truck carrying the goods from New Jersey to California caught fire in transit.  The fire destroyed all of the goods.

**14.** Green America Trucking (through TQL) tendered the limits of its $100,000 liability insurance to Master Textile for the loss of its goods during transit.

---

[4]    All exhibits entered into evidence are at Dkt. 76.

**15.** The total value of the goods was \$268,000.  The balance of \$168,000 is still outstanding.

**16.** No bill of lading was ever produced or delivered to RSA.

**17.** RSA never inquired regarding the value of the goods.

**18.** RSA was never affirmatively informed regarding the value of the goods.

## III.   THE PARTIES' POSITIONS

### a.  Master's Argument

Master asserts that RSA is liable as a carrier under the Carmack Amendment based on its performance in the United States for transportation services. Specifically, Master argues the agency agreement RSA has with DMK indicates that RSA is solely responsible for the movement of goods in the United States and that RSA's own actions demonstrate that it took full responsibility of the shipment from New Jersey to California.

Master emphasizes that under the totality of the circumstances RSA held itself out to the world as more than a broker of goods but as a carrier.  Additionally, Master asserts that RSA's failure to inquire as to the total value of the goods so that it might inform downstream transporter Green America and increase coverage cannot absolve it of liability in this instance.  Finally, Master insists that RSA's actions established a contract and that their failure to speedily resolve this issue is indicative of bad faith.

### b.  RSA's Argument

RSA argues that its role in the chain of distribution was not that of a carrier but as a freight forwarder.  Specifically, RSA asserts it did not physically transport

anything but ultimately arranged for Green America to do all transport. Its argument follows that because it did not ever physically control the goods – that is, no RSA employee physically touched or managed the goods – it cannot be said that it is liable under the Carmack Amendment.

RSA acknowledges that it is indeed a "freight forwarder" but it asserts that this nomenclature alone cannot automatically trigger liability unless its actions are covered by the Carmack Amendment. Finally, RSA argues that the Agency Agreement between it and DMK describes its roll as a freight forwarder only and not a carrier.

## IV.    DISCUSSION AND CONCLUSIONS OF LAW

The Carmack Amendment was originally enacted "to relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." *Reider v. Thompson*, 339 U.S. 113, 119 (1950). "The general rule under the Carmack Amendment is that an interstate carrier is strictly liable for damages up to the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) [certain intermediary carriers." *Choi v. ABF Freight Sys., Inc.*, 665 F. App'x 182, 183 (3d Cir. 2016) (cleaned up) (citing *Certain Underwriters at Int. at Lloyds of London v. United Parcel Serv. of Am., Inc.*, 762 F.3d 332, 335 (3d Cir. 2014)). It "imposes liability on carriers and freight forwarders but not on brokers, as those terms are defined in the statute." *Louis M. Marson Jr., Inc. v. All. Shippers, Inc.*, 438 F. Supp. 3d 326, 331 (E.D. Pa. 2020) (Padova, J.) (cleaned up). Accordingly, the central issue in this matter

is whether RSA is a "broker" or a "carrier/freight forwarder" under the Carmack Amendment.

The statute defines freight forwarder as follows:

The term "freight forwarder" means a person holding itself out to the general public (other than as a pipeline, rail, motor, or water carrier) to provide transportation of property for compensation and in the ordinary course of its business—

> **(A)** assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments;
> **(B)** assumes responsibility for the transportation from the place of receipt to the place of destination; and
> **(C)** uses for any part of the transportation a carrier subject to jurisdiction under this subtitle.

49 U.S.C. § 13102.  The Carmack Amendment itself explains that freight forwarders stand in the shoes of "both the receiving and delivering carrier."  49 U.S.C. § 14706. "The definition of 'carrier' includes "motor carriers," which are defined as 'person[s] providing motor vehicle transportation for compensation.  ["T]ransportation' is then defined to include 'services related to' (including 'arranging for') the movement of property.  Thus, the definition of 'carrier' encompasses entities that perform services other than physical transportation." *Tryg Ins. v. C.H. Robinson Worldwide, Inc.*, 767 F. App'x 284, 286 (3d Cir. 2019).  Conversely, a broker is an entity that agrees **only** to locate and hire a third party to transport goods.  *Louis M. Marson Jr., Inc.*, 438 F. Supp. 3d at 331.

An entity's status as either a broker or a carrier is not cabined by how it labels itself.  *Id.* at 332.  Instead, courts examine "how the party acted during the specific transaction at issue, which includes the understanding among the parties involved

6

and consideration of how the entity held itself out." *Id.* at 331 (cleaned up). This analysis is inherently fact specific. *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1302 (11th Cir. 2018) (citing *Nipponkoa Ins. Co. v. C.H. Robinson Worldwide, Inc.*, No. 09 CIV. 2365 PGG, 2011 WL 671747, at *5 (S.D.N.Y. Feb. 18, 2011)). If, on balance, the facts indicate that the defendant-entity legally bound itself to transport goods by accepting responsibility for ensuring their delivery, that entity qualifies as a carrier, regardless of whether it conducted the physical transportation. *Tryg Ins.*, 767 F. App'x at 287.

To be sure, parties may stake out their roles and responsibilities prior to taking possession of certain goods.

> [E]ven a company that carries some shipments and brokers others, can insulate itself from strict liability with respect to a particular shipment if it makes clear in writing that it is merely acting as a go-between to connect the shipper with a suitable third-party carrier. However, where no such writing exists, the operative inquiry is this: pursuant to the parties' agreement, with whom did the shipper entrust the cargo?

*Louis M. Marson Jr., Inc.*, 438 F. Supp. 3d at 332 (citing *Essex Ins. Co.*, 885 F.3d at 1302).

The bulk of the evidence at trial establishes that RSA acted as something more than a mere broker. First, CEO of non-party DMK, Wasim Khan testified that his company arranged for the subject goods to come into the custody of RSA at a port New Jersey. Trial Tr. at 30-31, Apr. 8, 2026. This arrangement was made based on an existing relationship between DMK and RSA established by a then-existing Agency Agreement signed by the parties in 2023. *Id.* at 26-27. That Agency Agreement buttresses Master's position that, in this specific instance, RSA's duty was

to "provide total multimodal freight services[.]" Pl.'s Ex. 1. The Agency Agreement further demonstrates that RSA expressly "assume[d] full responsibility for all Third Parties as selected by them." *Id.* Stated differently, RSA took the opportunity to specifically assume the liability position it took *vis-à-vis* DMK in the same manner contemplated by *Louis M. Marson Jr., Inc.*, *supra*, and chose to assume liability for any downstream harm that might become of the cargo. RSA presented no information that, prior to the accident, it intended to act outside the bounds of the Agency Agreement between it and DMK.

E-mail and text message exchanges further establish RSA's position as a carrier, with custody and control over the subject goods throughout the shipment process. On October 3, 2023, RSA CEO Mohammad Shahnawaz (Shahnawaz) contacted Master's sales and marketing representative Shoaib Ikram (Ikram) to confirm that the goods would be delivered to Lucky's warehouse in California. Pl.'s Ex. 22. Ikram responded to Shahnawaz for clarification. *Id.* The e-mail reads "DC means buyers [sic] warehouse please don't confuse it. We have to deliver the cargo to below mentioned address after taking appointment as per mentioned procedure." *Id.* Notably, this communication is addressed to RSA, DMK, and Master. This communication between the parties lends credence to the fact that RSA understood it had control and direction over the goods and was responsible for their safe delivery to California.

In separate WhatsApp communications between Ikram and Shahnawaz, occurring after the cargo was destroyed, the two men discuss Green America's $100,000 policy and who would be responsible for the balance. *See* Trial Tr. at 118-

8

119, Apr. 8, 2026; Pl.'s Ex. 20. This is the only instance wherein RSA refers to itself as a "broker" – conveniently only *after* the accident has occurred. However, the Customer Agreement between TQL and RSA belies this post-hac attempt to limit liability. That document reads:

> Contract Carriers are required to maintain cargo insurance in the amount of $100,000 per load. Customer will not tender loads valued in excess of $100,000 without first giving TQL sufficient written notice to arrange for increased insurance limits. Failure to provide such written notice prior to tender will result in Customer's loads being insured by Contract Carriers to a maximum of $100,000.

Pl.'s Ex. 10. At the bottom of the document RSA identifies itself in the signature line as the "Customer." This writing makes plain that it was RSA's had possession of the load and it was its responsibility to inform TQL how the value of those goods if it wanted to escape the default liability provision.

Separate e-mail communications between RSA and TQL confirm Mr. Shahnawaz's fundamental misunderstanding of the liability landscape. On October 24, 2023, a TQL representative acknowledges receipt of the claim demand and reminds Mr. Shahnawaz that the waiver on file indicates a maximum coverage of $100,000. Pl.'s Ex. 15. The TQL representative goes on to ask whether "TQL [was] notified of the load value being over $100,000 before the load was booked[.]" *Id.* In response Mr. Shahnawaz indicates that TQL never asked him about the value of the goods before being booked. *Id.* This premise contradicts the responsibilities outlined in RSA's Customer Agreement with TQL.

These communications combined with the liability agreements to which RSA voluntarily made itself a party also highlight another important factor. In this

9

matter, RSA has essentially book-ended itself into the liability for the balance of the destroyed goods. Upstream in the distribution chain, it has a Agency Agreement with DMK which not only indicates that RSA provides multimodal freight services (not just brokerage), but that it also takes full responsibility for third-party entities it may ultimately engage to accomplish delivery. Pl.'s Ex. 1. Downstream, RSA's agreement with TQL caps the available liability coverage to $100,000. RSA had two opportunities to limit its liability in this matter which strongly suggests that it was acting as more than a broker, as brokers are not strictly liable under the Carmack Amendment. *Cf. Essex Ins. Co.*, 885 F.3d at 1302 (observing that that entities performing dynamic carrier/broker services can limit their liability by way of a writing).

What is clear is that Master engaged DMK to assist with a shipping problem in the port in New Jersey. DMK brokered a deal with RSA who was paid by Master to transport their goods. Trial Tr. at 88-89, Apr. 8, 2026; Pl.'s Ex. 7; Pl.'s Ex. 24. From at least the date of the payment from Master to RSA, Master understood that it was entrusting its wares to RSA. Pl.'s Ex. 7. This stands in important contrast with Master's relationship with DMK, who appears to have performed brokerage services only.

Further, and perhaps most damning for RSA, is that it referred to itself throughout trial as a "freight forwarder." The Carmack Amendment explains that freight forwarders stand in the shoes of "both the receiving and delivering **carrier**." 49 U.S.C. § 14706 (emphasis added). Although it is the specific actions, and not the particular label, of a defendant that dictate liability, this self-identification combined

10

with all of the circumstances described above indicate that RSA was performing "total multimodal freight services" consistent with its Agency Agreement with DMK.

## V.   CONCLUSION

For the foregoing reasons, the Court concludes that RSA acted as a carrier under the Carmack Amendment with respect to the October 2023 shipment of the subject cargo.[5]  As order consistent with the Memorandum will follow.[6]

BY THE COURT:

_____
GAIL WEILHEIMER        J.

---

[5]   As indicated above, Master brought both common law breach of contract and bad faith claims. *See* Pl.'s Compl. at ¶¶ 23-29.  "The Courts of Appeals have [ ] unanimously held that the Carmack Amendment preempts all state or common law remedies available to a shipper against a carrier for loss or damage to interstate shipments." *Certain Underwriters at Int. at Lloyds of London*, 762 F.3d at 336.  Notably, Plaintiff's counsel did not plead the common law claims in the alternative. Hypothetically, were the Court to have determined that RSA was a broker and not a carrier, the common law breach of contract and bad faith claims may have been viable.  *See Louis M. Marson Jr., Inc.*, 438 F. Supp. 3d at 337.  Even if these were legally viable causes of action, it remains the Plaintiff's burden to prove them at trial.  Plaintiff failed to carry that burden.

[6]   The Court notes that the facts and arguments, as set forth herein, are presented with substantially greater clarity than they were by Plaintiff's counsel at any stage of this litigation.  While it is the Court's obligation to evaluate the record and apply the law to reach a just result, it is not the Court's role to assume the functions of counsel to develop facts and arguments where counsel has failed to do so. The Court cautions that this verdict should not be understood as an endorsement of the manner in which Plaintiff's case was presented, nor as an approach that would warrant repetition.